

FILED

2024 Aug-09  AM 09:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| Derrick Singleton; Ray Traylor; and Deandra Whitehead, on behalf of themselves and all similarly situated individuals, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: |
| | ) | Class Action |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| John Q. Hamm, in his individual capacity; Gregory Lovelace, in his individual capacity; Alcornelia Terry, in his individual capacity; Jefferson Dunn, in his individual capacity; Cam Ward, in his individual capacity; Leigh Gwathney, in her individual capacity; Darryl Littleton, in his individual capacity; Gabrelle Simmons, in her individual capacity; Kim Davidson, in her individual capacity; and Dwayne Spurlock, in his individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Derrick Singleton, Ray Traylor, and Deandra Whitehead, individually and on behalf of all similarly situated individuals, file this class action complaint against John Q. Hamm, Gregory Lovelace, and Alcornelia Terry of the Alabama Department of Corrections; Cam Ward, Leigh Gwathney, Darryl Littleton, and Gabrelle Simmons of the Alabama Bureau of Pardons and Paroles; Jefferson Dunn, previously of the Alabama Department of Corrections; and Kim Davidson and Dwayne Spurlock, previously of the Alabama Bureau of Pardons and Paroles. All defendants are sued in their individual capacities. Plaintiffs allege as follows:

## INTRODUCTION

1.      Every year, the Alabama Department of Corrections (the "Department") and the Alabama Bureau of Pardons and Paroles (the "Bureau") cause thousands of Alabamians to be imprisoned beyond their legally mandated release dates. In doing so, these agencies violate the constitutional rights of Alabamians and disregard clear legislative directives designed to save taxpayer money, increase public safety, and reduce recidivism.

2.      In 2015, the Alabama legislature passed Alabama Code § 15-22-26.2 (the "Mandatory Release Law"), which was designed to reduce recidivism and address unconstitutional prison overcrowding. The legislature sought to accomplish these goals by directing that eligible individuals "shall be released by the department to supervision by the Board of Pardons and Parole" (the "Board"), a three-member subdivision of the Bureau, a specified number of months before the individuals' calculated end-of-sentence dates. Essentially, the Mandatory Release Law converted the final months of every eligible person's carceral sentence to a period of post-release supervision.

3.      Although the law is titled "*Mandatory* Release to Supervision" and its text uses the compulsory "shall" when discussing the Department and the Board's duties, both agencies treat

1

the law as discretionary. The Department maintains policies that treat individuals as *eligible* for mandatory release, not *entitled* to it, and the Bureau maintains policies that interpret the Board's directive to supervise individuals on mandatory release as *elective*, not *obligatory*.

4.     Because of the Department and the Bureau's policies, thousands of Alabamians are held in prison past their legally mandated release dates. Some prisoners are overdetained only a few days, some as long as a full year.

5.     This overdetention causes serious harms. The violence, hazardous conditions, ubiquity of drugs and drug abuse, and lack of adequate medical care in Alabama's prisons are well documented. Some prisoners have been seriously injured or denied necessary medical treatment during their overdetentions. Some have died.

6.     Additionally, despite the deplorable conditions of Alabama's prisons, incarcerating individuals is expensive. The Department and the Bureau thus waste hundreds of thousands of taxpayer dollars each year by overdetaining people.

7.     Despite their knowledge of this widespread overdetention, the Department and the Bureau have not adjusted their policies and practices to reduce the rates of overdetention in the eight years since the Mandatory Release Law went into effect. Instead, they continue to interpret the law's directives as mere suggestions and to treat mandatory release as discretionary. Their conduct knowingly and systematically violates Alabamians' constitutional rights under the Eighth and Fourteenth Amendments to the Constitution of the United States, as well as state law.

## JURISDICTION AND VENUE

8.     Plaintiffs bring this action under 42 U.S.C. § 1983 to redress the deprivation under color of law of their rights as secured by the Eighth and Fourteenth Amendments to the Constitution of the United States and the Ex Post Facto Clause of the same.

9.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

10.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b) because events giving rise to the claims asserted in this Complaint occurred in this judicial district.

## PARTIES

*Plaintiffs*

12.     All three named plaintiffs were held in the custody of the Department past their legally mandated release dates. This Complaint collectively refers to all named plaintiffs as "Plaintiffs."

13.     Plaintiff Derrick Singleton was released from the custody of the Department on February 27, 2024, after completing two concurrent fifteen-year sentences. The Mandatory Release Law required that the Department release him to supervision by the Board no less than twelve months before his calculated end-of-sentence date, or December 28, 2023. He was nevertheless illegally held at the Childersburg Community Work Center in Talladega County for sixty-one additional days, until February 27, 2024.

14.     Plaintiff Ray Traylor was released from the custody of the Department on December 26, 2023, after completing a ten-year sentence. The Mandatory Release Law required that the Department release him to supervision by the Board no less than twelve months before his calculated end-of-sentence date, or December 24, 2023. Instead, he was illegally held at the Loxley Community Work Center in Baldwin County until December 26, 2023.

15.     Plaintiff Deandra Whitehead was released from the custody of the Department on February 13, 2024, after completing a ninety-seven-month sentence. The Mandatory Release Law required that the Department release her to supervision by the Board no less than six months before

her calculated end-of-sentence date, or October 12, 2023. Instead, she was illegally held at Tutwiler

Prison in Elmore County for 124 additional days, until February 13, 2024.

16.     The following chart illustrates Plaintiffs' overdetentions:

| Plaintiff | Required Release Date | Actual Release Date | Length of Overdetention |
|---|---|---|---|
| Derrick Singleton | December 28, 2023 | February 27, 2024 | 61 days |
| Ray Traylor | December 24, 2023 | December 26, 2023 | 2 days |
| Deandra Whitehead | October 12, 2023 | February 13, 2024 | 124 days |

*Defendants*

17.     The defendants include current and past members of the Department's Executive

Leadership team. The Complaint collectively refers to Defendants Hamm, Dunn, Lovelace, and

Terry as the "Corrections Defendants." Each of the Corrections Defendants is or was responsible

for ensuring the timely release of individuals from the Department's custody at the end of those

individuals' carceral sentences. Each of the Corrections Defendants also is or was responsible for

developing, implementing, and enforcing the policies necessary to ensure the same. Each is sued

in his individual capacity.

18.     The defendants also include the Director of the Bureau and current and past

members of the Board. The Complaint collectively refers to Defendants Ward, Gwathney,

Littleton, Simmons, Davidson, and Spurlock as the "Parole Defendants." Each of the Parole

Defendants is or was responsible for ensuring that individuals released on mandatory release are

supervised by the Board. Each of the Parole Defendants also is or was responsible for developing,

implementing, and enforcing the policies necessary to ensure the same. Each is sued in his or her

individual capacity.

19.     Defendant John Q. Hamm is the Commissioner of the Department, the state agency

that administers the prison system in Alabama. He has held that position since January 1, 2022.

The Department is responsible for accurately calculating the release dates of all individuals in its

custody and timely releasing people from its custody. As Commissioner, Defendant Hamm is responsible for the oversight of every aspect of the Department. He personally supervises the activities of the Department, and he is responsible for implementing the rules, regulations, procedures, and standards governing the prison system in Alabama. Defendant Hamm is responsible for creating and/or maintaining policies and practices to ensure that individuals' release dates are accurately calculated and creating and/or maintaining policies and practices to ensure that individuals are timely released from incarceration upon their release dates. Defendant Hamm's official duties require him to be aware of the Department's release trends, including the Department's systematic overdetention of people past their latest mandatory dates. He has the power, authority, and responsibility to implement policies and/or practices to ensure that individuals are timely released on mandatory release; to designate another person to implement those policies and/or practices; and to ensure that the policies and practices of the Department comply with the U.S. Constitution. Defendant Hamm is a final policymaker for the Department. He is sued in his individual capacity.

20.     Defendant Jefferson Dunn was the Commissioner of the Department from April 1, 2015, until January 1, 2022. As Commissioner, Defendant Dunn was responsible for the oversight of every aspect of the Department. He personally supervised the activities of the Department, and he was responsible for implementing the rules, regulations, procedures, and standards governing the prison system in Alabama. When he was Commissioner, Defendant Dunn was responsible for creating and/or maintaining policies and practices to ensure that individuals' release dates are accurately calculated and creating and/or maintaining policies and practices to ensure that individuals are timely released from incarceration upon their release dates. Defendant Dunn's official duties as Commissioner required him to be aware of the Department's release trends, including the Department's systematic overdetention of people past their latest mandatory dates.

He had the power, authority, and responsibility to implement policies and/or practices to ensure that individuals are timely released on mandatory release; to designate another person to implement those policies and/or practices; and to ensure that the policies and practices of the Department comply with the U.S. Constitution. As Commissioner, Defendant Dunn was a final policymaker for the Department. He is sued in his individual capacity.

21.     Defendant Greg Lovelace is the Chief Deputy Commissioner of Corrections of the Department. He has held that position since in or about May 2022. As Chief Deputy Commissioner of the Department, Defendant Lovelace is responsible for management and oversight of all operations and administrative divisions of the Department. Defendant Lovelace personally supervises the activities of the Department, and he is responsible for implementing the rules, regulations, procedures, and standards governing the administration of the prison system in Alabama. He is responsible for creating and/or maintaining policies and practices that ensure individuals' release dates are accurately calculated and creating and maintaining policies and practices to ensure that individuals are timely released from incarceration upon their release dates. Defendant Lovelace's official duties require him to be aware of the Department's release trends, including the Department's systematic overdetention of people past their latest mandatory dates. He has the power, authority, and responsibility to implement policies and practices to ensure that individuals are timely released on mandatory release; to designate another person to implement those policies and practices; and to ensure that the policies and practices of the Department comply with the U.S. Constitution. As Chief Deputy Commissioner, Defendant Lovelace is a final policymaker for the Department. He is sued in his individual capacity.

22.     Defendant Alcornelia Terry is the Director of the Central Records Division of the Department. Defendant Terry personally supervises the activities of the Central Records Division, and he is responsible for implementing the rules, procedures, and standards relating

6

to the operation of that division. Defendant Terry is responsible for ensuring that the release date of each person in Department custody is accurately computed and sufficiently tracked to ensure that each person is timely released from Department custody and for communicating each person's release date to the warden or designee of each appropriate facility. He is responsible for completing all administrative documentation related to the release of every individual from Department custody and forwarding that documentation to the appropriate facility before an individual is released on mandatory release. As the Director of Central Records, Defendant Terry's official duties require him to be aware of the Department's release trends, including the Department's systematic overdetention of people past their latest mandatory dates. He has the power, authority, and responsibility to implement policies and practices to ensure that individuals are timely released on mandatory release; to designate another person to implement those policies and practices; and to ensure that the policies and practices of the Department related to releasing people from Department custody comply with the U.S. Constitution. As Director of Central Records, Defendant Terry is a final policymaker for the Department. He is sued in his individual capacity.

23.    Defendant Cam Ward is the Director of the Bureau, the State agency that administers the parole system in Alabama. He has held that position since on or about December 7, 2020. Defendant Ward personally supervises the activities of the Bureau, which includes the three-member Board, and he is responsible for implementing the rules, regulations, procedures, and standards governing the administration of the parole system in Alabama. Defendant Ward is also responsible for all agency operations in support of the Board. As Director, he is a final policymaker for the Bureau. Defendant Ward is sued in his individual capacity.

24.    Defendant Leigh Gwathney is the Chair of the Board. The Board is a group of officials within the Bureau tasked by statute with making decisions to grant, deny, or revoke discretionary parole. The Board also supervises all individuals released on parole in Alabama,

including those released under the Mandatory Release Law. Defendant Gwathney has been Chair of the Board since in or about October 2019. She personally supervises the activities of the Board, and she is responsible for adopting the rules, regulations, procedures, and standards governing the administration of the parole system in Alabama. As Chair of the Board, she is a final policymaker for the Bureau. Defendant Gwathney is sued in her individual capacity.

25.    Defendant Darryl Littleton is an Associate Member of the Board, and he has held that position since on or about July 7, 2021. Defendant Littleton personally supervises the activities of the Board, and he is responsible for adopting the rules, regulations, procedures, and standards governing the administration of the parole system in Alabama. As an Associate Member of the Board, he is a final policymaker for the Bureau. Defendant Littleton is sued in his individual capacity.

26.    Defendant Gabrelle Simmons is an Associate Member of the Board, and she has held that position since in or about August 2023. Defendant Simmons personally supervises the activities of the Board, and she is responsible for adopting the rules, regulations, procedures, and standards governing the administration of the parole system in Alabama. As an Associate Member of the Board, she is a final policymaker for the Bureau. Defendant Simmons is sued in her individual capacity.

27.    Defendant Kim Davidson was an Associate Member of the Board from on or about March 10, 2023, through in or about July 2023. During that time, Defendant Davidson personally supervised the activities of the Board, and she was responsible for adopting the rules, regulations, procedures, and standards governing the administration of the parole system in Alabama. As an Associate Member of the Board, she was a final policymaker for the Bureau. Defendant Davidson is sued in her individual capacity.

28.     Defendant Dwayne Spurlock was an Associate Member of the Board from in or about 2016 through December 2022. During that time, Defendant Spurlock personally supervised the activities of the Board, and he was responsible for adopting the rules, regulations, procedures, and standards governing the administration of the parole system in Alabama. As an Associate Member of the Board, he was a final policymaker for the Bureau. Defendant Spurlock is sued in his individual capacity.

## FACTUAL ALLEGATIONS

*The Mandatory Release Law*

29.     As of September 2014, Alabama had the most crowded prison system in the nation.[1] Its prisons were operating at 195 percent capacity, with 26,029 people incarcerated in facilities designed to hold 13,318.[2]

30.     Between 2009 and 2014, Alabama's crime, arrest, and felony sentencing rates all declined, as did the number of people sentenced to serve time in prison.[3] Its prison population nevertheless remained stable because its parole rate also declined.[4]

31.     Between 2009 and 2013, the number of people released on parole each year dropped by thirty percent—from 3280 people in 2009 to 2312 people in 2013.[5]

---

[1] Justice Center, *Justice Reinvestment in Alabama: Analysis and Policy Framework* (March 2015), pdf 1, *available at* https://csgjusticecenter.org/publications/justice-reinvestment-in-alabama-analysis-and-policy-framework/.

[2] *Id.* at 18.

[3] *Id.*

[4] *Id.* at 20.

[5] *Id.*

32.    Releasing people from prison to parole supervision reduces recidivism,[6] but Alabama's declining parole rates meant that more people ended their sentences in prison and were released without any supervision. In 2013, thirty-four percent of people released from Alabama prisons received no supervision after their release.[7]

33.    In response to these issues, in February 2014, the Alabama legislature created the bipartisan, interbranch Prison Reform Task Force to study problems with Alabama's criminal justice system and propose solutions.

34.    Defendant Ward, then a member of the Alabama Senate, was appointed the Chair of the Task Force.

35.    With support from the Council of State Governments Justice Center, the Pew Charitable Trusts, and the U.S. Department of Justice's Bureau of Justice Assistance, the Task Force created the Justice Reinvestment Policy Framework. The Justice Reinvestment Policy Framework was designed to "strengthen community-based supervision, prioritize prison space for violent and dangerous offenders, ensure supervision for everyone upon release from prison, and expand electronic victim notification."[8]

36.    The Prison Reform Task Force voted nearly unanimously to support the Justice Reinvestment Policy Framework and develop the proposed policies into legislation.

---

[6] *See id.* at 27. One study showed that eighteen percent of people released to parole supervision were convicted of a new offense within three years of release, while twenty-seven percent of people released without supervision were convicted of a new offense within three years of release. *Id.*

[7] *Id.*

[8] Justice Center, *Alabama's Justice Reinvestment Approach* (May 2015), pdf 1–2, *available at* https://csgjusticecenter.org/publications/alabamas-justice-reinvestment-approach/.

37.     One piece of legislation resulting from the Justice Reinvestment Policy Framework was the Justice Reinvestment legislation, also known as Senate Bill 67 ("SB 67"). Defendant Ward and Representative Mike Jones sponsored SB 67.

38.     SB 67 received significant bipartisan support, passing with votes of 100–5 in the House and 27–0 in the Senate. Governor Robert Bentley signed it into law on May 18, 2015.

39.     The reforms enacted by SB 67 were projected to reduce the number of incarcerated people by sixteen percent and to save Alabama more than $380 million between 2015 and 2021.[9]

40.     Soon after its enactment, the Department described SB 67 as "historic criminal justice reforms designed to significantly reduce the state's prison population and bolster public safety through an overhaul of how people are supervised after being released from incarceration."[10]

41.     Defendant Dunn, who was then the Commissioner of the Department, described SB 67 as an "historic criminal justice reform initiative" that would "lead to safer prisons, safer communities and a safer Alabama."[11]

42.     Defendant Ward said that SB 67 included "historic changes for [Alabama] that will be a building block for future changes in our corrections system."[12]

43.     SB 67 went into effect on January 30, 2016, and a portion of it became Alabama Code § 15-22-26.2, also known as the Mandatory Release Law.

---

[9] Ala. Dep't of Corrections, *Governor Bentley Signs Historic Criminal Justice Reform Legislation into Law*, https://doc.alabama.gov/NewsRelease?article=Governor+Bentley+Signs+Historic+Criminal+Justice+Reform+Legislation+into+Law+ (last accessed July 23, 2024).

[10] *Id.*

[11] *Id.*

[12] *Id.*

44.     The Mandatory Release Law was designed to further the goals of SB 67. It shortened the carceral sentences of everyone to whom it applied, converting the last months of their sentences from terms of incarceration into terms of parole. As a result, it would save Alabama money by reducing the population of Alabama's overcrowded prisons, and it would reduce recidivism by releasing incarcerated people back into their communities under supervision.

45.     The full text of the original Mandatory Release Law, effective January 30, 2016, provided:

### § 15-22-26.2. Mandatory supervision period on a straight sentence.

(a) A convicted defendant sentenced to a period of confinement under the supervision of the Department of Corrections shall be subject to the following provisions, unless the defendant is released to a term of probation or released on parole under the provisions of Chapter 22 of Title 15:

(1) If the defendant is sentenced to a period of five years or less, he or she shall be released to supervision by the Board of Pardons and Paroles no less than three months and no more than five months prior to the defendant's release date;

(2) If the defendant is sentenced to a period of more than five years but less than 10 years, he or she shall be released to supervision by the Board of Pardons and Paroles no less than six months and no more than nine months prior to the defendant's release date; or

(3) If the defendant is sentenced to a period of 10 years or more, he or she shall be released to supervision by the Board of Pardons and Paroles no less than 12 months and no more than 24 months prior to the defendant's release date.

(b) The provisions of this section shall not apply to a defendant convicted of any sex offense involving a child, as defined in Section 15-20A-4.

(c) Prior to the defendant's release to supervision pursuant to this section, notice of such release shall be provided to the victim and interested parties through the victim notification system established pursuant to Section 15-22-36.2 and under the provisions of Section 15-22-36.

(d) Release of an offender to supervision pursuant to this section shall be release to an intensive program under the supervision of the Board of Pardons and Paroles.[13]

46.     When the Mandatory Release Law went into effect on January 30, 2016, it applied to everyone except:

a.     Individuals whose crimes of conviction occurred before January 30, 2016;[14]

b.     Individuals already released on parole;[15]

c.     Individuals released to probation;[16]

d.     Individuals convicted of a sex offense involving a child, as defined in Alabama Code § 15-20A-4;[17] and

e.     Individuals serving life sentences.[18]

---

[13] Ala. Code § 15-22-26.2 (2016).

[14] S.B. 67, 2015 Reg. Sess. 145 ¶¶ 5–7, 147 ¶ 2 (Ala. 2015), https://alison.legislature.state.al.us/files/pdf/SearchableInstruments/2015RS/PrintFiles/SB67-Enr.pdf.

[15] Ala. Code § 15-22-26.2(a).

[16] *Id.* This group is mostly individuals who are given "split sentences"—sentences imposed under Alabama's Split Sentence Act, Ala. Code § 15-18-8. The Split Sentence Act authorizes judges, in some situations, to (1) impose a carceral sentence of up to twenty years, (2) order that the defendant be confined in prison for up to five years of that sentence, (3) order that the remainder of the imposed sentence be suspended, and (4) order that the defendant be placed on probation once he or she has served the carceral period of his or her sentence. Ala. Code § 15-18-8(a). When a sentence is imposed under the Split Sentence Act, the defendant is automatically released to a term of probation, *id.*, and is therefore exempted from the Mandatory Release Law, *id.* § 15-22-26.2(a).

[17] *Id.* § 15-22-26.2(b) (2016).

[18] Individuals serving life sentences are not technically exempted from the Mandatory Release Law, but they are exempted in practice—individuals serving life sentences do not have release dates, so by extension, they do not have mandatory release dates.

13

47. By using the mandatory "shall"—not the discretionary "may"—the Mandatory Release Law stripped the Department of any discretion to refuse to release every eligible individual onto mandatory release.

48. But it did give the Department discretion in determining *when* to release eligible individuals onto mandatory release. The law established two relevant dates for every eligible individual: the earliest date on which the Department *may* release the individual to supervision by the Board (the individual's "earliest mandatory release date"); and the latest date by which the Department *must* release the individual to supervision by the Board (the individual's "latest mandatory release date"). These two dates establish every eligible individual's "mandatory release range."

49. Individuals' mandatory release ranges are dictated by the length of their sentences. The Mandatory Release Law established the following mandatory release ranges:

    a.    Individuals serving sentences of five years or less: three to five months before their ends-of-sentence;

    b.    Individuals serving sentences of more than five years but less than ten years: six to nine months before their ends-of-sentence;

    c.    Individuals serving sentences of ten years or more: twelve to twenty-four months before their ends-of-sentence.

50. Although the Mandatory Release Law gave the Department the limited discretion to release individuals during a specified period of time *before* their latest mandatory release dates, it did not give the Department discretion to hold individuals *after* their latest mandatory release dates. After an individual's latest mandatory release date passes, the Department has no legal authority to incarcerate that individual; it is *required* to release the individual to supervision by the Board.

51.     Similarly, the Mandatory Release Law did not give the Board discretion about whether to supervise individuals on mandatory release. After an individual's latest mandatory release date passes, the Board has no legal authority to decline to accept that individual onto parole; it is *required* to supervise that individual.[19]

52.     The Mandatory Release Law thus effectively shortened every eligible individual's carceral sentence by between three and twelve months, depending on the length of the individual's original sentence, and added a corresponding period of supervision:

      a.    Individuals sentenced to five years or less: at least three months;

      b.    Individuals sentenced to more than five years but less than ten years: at least six months;

      c.    Individuals sentenced to ten years or more: at least twelve months.

53.     Five years after the original Mandatory Release Law went into effect, during a 2021 special legislative session on prison reform, lawmakers passed House Bill 2 ("HB 2"). HB 2 amended the Mandatory Release Law in several ways.[20]

---

[19] Defendants Gwathney, Littleton, and Simmons, through counsel from the Office of the Alabama Attorney General, acknowledged the mandatory nature of this release in a recent filing in the U.S. District Court for the Middle District of Alabama. In a response in opposition to a motion for preliminary injunction and preliminary class certification in *Council v. Ivey*, Defendants Gwathney, Littleton, and Simmons asserted:

> Unlike parole, which is at the Board's complete discretion, the Alabama Legislature enacted a Mandatory Release Program *which requires an inmate's release from prison prior to the end of their sentence. See* ALA. CODE § 15-22-26.2. Further, inmates are released to the Board's supervision which effectively makes Mandatory Release, mandatory parole by another name.

No. 2:23-cv-712-CLM-JTA, ECF No. 57, at 82 (M.D. Ala.).

[20] *See* H.B. 2, 1st Spec. Sess. (Ala. 2021), https://legiscan.com/AL/text/HB2/id/2435234/Alabama-2021-HB2-Enrolled.pdf.

54.     HB 2 added a retroactivity provision to the Mandatory Release Law, making the law applicable to everyone regardless of their offense dates.[21]

55.     HB 2 also substantially shortened the period of supervision for people sentenced to imprisonment for ten years or more: it reduced those individuals' mandatory release ranges from twelve to twenty-four months to ten to twelve months.[22] By reducing the mandatory release range for people sentenced to imprisonment for ten years or more, HB 2 increased the total carceral sentence for people whose crimes of conviction occurred while the original Mandatory Release Law was in effect.

56.     Governor Kay Ivey signed HB 2 into law on October 1, 2021, but its amendments to the Mandatory Release Law did not go into effect until January 31, 2023.[23] It was structured this way at the Bureau's request so the Bureau would have more time to prepare to supervise the additional people who would be released when the Mandatory Release Law became retroactive.[24]

57.     The full text of the amended Mandatory Release Law, effective January 31, 2023, provides:

### § 15-22-26.2. Mandatory supervision period on a straight sentence.

(a) A convicted defendant sentenced to a period of confinement under the supervision of the Department of Corrections shall be subject to the following provisions, unless the defendant is released to a term of probation or released on parole under this chapter:

(1) If the defendant is sentenced to a period of five years or less, he or she shall be released by the department to

---

[21] *See* Ala. Code § 15-22-26.2(f) (2023).

[22] *Id.* § 15-22-26.2(a)(3).

[23] *Supra* note 20 at 6–7.

[24] *See* Eddie Burkhalter, *Alabama House Approves Bill Expanding Early Release, Supervision of Inmates*, Ala. Pol. Rep. (Mar. 17, 2021), https://www.alreporter.com/2021/03/17/alabama-house-approves-bill-expanding-early-release-supervision-of-inmates/.

supervision by the Board of Pardons and Paroles no less than three months and no more than five months prior to the defendant's release date.

(2) If the defendant is sentenced to a period of more than five years but less than 10 years, he or she shall be released by the department to supervision by the Board of Pardons and Paroles no less than six months and no more than nine months prior to the defendant's release date.

(3) If the defendant is sentenced to a period of 10 years or more, he or she shall be released by the department to supervision by the Board of Pardons and Paroles no less than 10 months and no more than 12 months prior to the defendant's release date.

(b) This section shall not apply to a defendant convicted of any sex offense involving a child, as defined in Section 15-20A-4.

(c) Prior to the defendant's release to supervision pursuant to this section, notice of the release shall be provided by the department to the victim and interested parties through the victim notification system established pursuant to Section 15-22-36.2.

(d)

(1) An offender released to supervision pursuant to this section shall be released to the supervision of the Board of Pardons and Paroles and shall be subject to this article.

(2) The board shall determine the level of supervision required for an offender based on the results of a validated risk and needs assessment.

(e)

(1) An offender released pursuant to this section shall be subject to electronic monitoring for a period of time determined by the director.

(2) The board shall be responsible for the costs of the electronic monitoring as required by this subsection.

> (f) This section applies to a defendant in the custody of the department without regard to when he or she was sentenced for or committed the crime.[25]

58.     Like the original Mandatory Release Law, the amended Mandatory Release Law applies to everyone except individuals already released to parole; individuals released to probation; individuals convicted of a sex crime against a child, as defined in Alabama Code § 15-20A-4; and individuals serving life sentences.

59.     The amended Mandatory Release Law retained the mandatory "shall" when describing the Department's duties to release people and the Board's duties to supervise people.

60.     The amended Mandatory Release Law established the following mandatory release ranges for all eligible individuals:

   a.     Individuals serving sentences of five years or less: three to five months before their ends-of sentence;

   b.     Individuals serving sentences of more than five years but less than ten years: six to nine months before their ends-of-sentence;

   c.     Individuals serving sentences of ten years or more: ten to twelve months before their ends-of-sentence.

61.     Like the original Mandatory Release Law, the amended Mandatory Release law gives the Department the discretion to release individuals during a specified period of time *before* their latest mandatory release dates, but it gives the Department no discretion to hold individuals *after* their latest mandatory release dates. After an individual's latest mandatory release date passes, the Department has no legal authority to incarcerate that individual; it is *required* to release the individual to supervision by the Board.

---

[25] Ala. Code § 15-22-26.2 (2023).

62.     Similarly, the amended Mandatory Release Law did not give the Board discretion about whether to supervise individuals on mandatory release. After an individual's latest mandatory release date passes, the Board has no legal authority to decline to accept that individual onto parole; it is *required* to supervise that individual.

63.     Individuals' constitutional rights are violated when they remain incarcerated past their latest mandatory release dates instead of being released to supervision by the Board.

*Overdetention Causes Serious Harms*

64.     Each day an individual is overdetained results in lost time with family, lost contributions to communities, lost job opportunities, and a loss of fundamental freedoms. Each day also seriously threatens their safety.

65.     Alabama's prison conditions are historically among the worst in the nation.

66.     In October 2016, the U.S. Department of Justice opened a statewide investigation under the Civil Rights of Institutionalized Persons Act into the conditions of Alabama's prisons for men. The investigation focused on whether prisoners are adequately protected from physical harm and sexual abuse by other prisoners; whether prisoners are adequately protected from excessive force and sexual abuse by correctional officers; and whether Alabama's prisons provide safe, sanitary, and secure living conditions.

67.     The DOJ published the report of its investigation in April 2019.[26] The report concluded that reasonable cause existed to believe that "Alabama routinely violates the constitutional rights of prisoners housed in the Alabama's prisons [sic] by failing to protect them from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, and by failing to

---

[26] *See* U.S. Dep't of Justice, *Notice Regarding Investigation of Alabama's State Prisons for Men*, *available at* https://www.justice.gov/d9/press-releases/attachments/2019/04/03/notice_letter_and _report_aldoc.pdf.

provide safe conditions," and that the violations "are exacerbated by serious deficiencies in staffing and supervision and overcrowding."[27]

68.    The investigation "revealed that an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis."[28]

69.    At the time, Alabama's prisons for men had the highest homicide rate in the country. Its 2017 homicide rate was 56 per 100,000 prisoners—approximately eight times the 2014 national average homicide rate of 7 per 100,000 prisoners.[29]

70.    Since 2019, the homicide rate in Alabama's prisons has gone up.

71.    In 2023, the Department reported 15 homicides across all its facilities, which housed approximately 20,000 prisoners. That corresponds to a homicide rate of 75 per 100,000 prisoners—more than ten times the 2014 national average homicide rate and more than twelve times the 2019 national average homicide rate for state prisoners of 6 per 100,000 prisoners.[30]

72.    But Alabama's prisons are not deadly only because of violence.

73.    In 2019, the national average overall mortality rate for state prisoners nationwide was 273 per 100,000 prisoners. In 2023, the Department reported 325 total deaths across its

---

[27] *Id.* at 1.

[28] U.S. Dep't of Justice, *Investigation of Alabama's State Prisons for Men* (Apr. 2, 2019) ("2019 DOJ Report") 2, https://www.justice.gov/crt/case-document/file/1149971/download.

[29] *Id.* at 6.

[30] U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Mortality in State and Federal Prisons, 2001–2019 – Statistical Tables* ("Mortality in State and Federal Prisons") at 8, *available at* https://bjs.ojp.gov/library/publications/mortality-state-and-federal-prisons-2001-2019-statistical-tables.

prisons—a mortality rate of 1625 per 100,000 prisoners, or nearly six times the 2019 national average.[31]

74.     Drugs and deadly drug overdoses are also common in Alabama's prisons. The Department reported 111 total deaths from drug overdoses during 2023—a death rate of 555 per 100,000 prisoners. The 2019 national average overdose death rate for state prisoners was 6 per 100,000 prisoners,[32] meaning that Alabama's 2023 drug overdose rate was more than ninety-two times the 2019 national average.

75.     The prevalence of drugs in Alabama's prisons is dangerous for reasons beyond overdoses. Alabama prisoners are "subjected to severe violence related to the [prison] drug trade."[33] Prisoners under the influence of drugs behave violently and erratically toward other prisoners, and drug debts fuel assaults, extortion, and sexual abuse.

76.     Further compounding the risks, Alabama's prisons are full of weapons. In 2023, the Department reported confiscating 5501 weapons, including eleven firearms. Alabama's total prison population that year was approximately 20,000 people, equating to one weapon confiscated for every 3.6 people.[34]

77.     Sexual assault is also commonplace. In 2019, the U.S. Department of Justice reported that "[s]exual abuse in Alabama's prisons is severe and widespread, and it is too often

---

[31] In 2022, the Department reported 271 total deaths across its prisons—a mortality rate of 1355 per 100,000 prisoners, or nearly five times the 2019 national average.

[32] *Mortality in State and Federal Prisons* at 8.

[33] 2019 DOJ Report at 30–31.

[34] In 2022, the Department reported 6289 weapon confiscations, including sixteen firearms, equating to one weapon for every 3.2 people.

undetected or prevented by [Department] staff."[35] And correctional staff do not protect prisoners from sexual assault. After reviewing hundreds of reports, the Department of Justice "did not identify a single incident in which a correctional officer or other staff member observed or intervened to stop a sexual assault."[36]

78.     Exacerbating all these dangers, Alabama's prisons are extraordinarily overcrowded.

79.     In 2023, the Department reported an average total population of 20,150 people. Those prisoners were housed in facilities designed for 12,115 people, meaning that Alabama's prisons operated in 2023 at 166% of capacity. In 2017, when operating at 167.8% of capacity, Alabama's prisons were the most overcrowded prisons in the country.[37]

80.     Overcrowded prisons can be dangerous for many reasons. Prison overcrowding is associated with higher levels of depression, suicide, violence, and illness. Communicable diseases, including COVID-19, can spread like wildfire.

81.     Alabama, like many states, responded to prison overcrowding by converting common areas into "open dormitories"—large rooms filled with bunk beds packed closely together. These makeshift living arrangements create visibility problems because officers cannot see across the dormitory to monitor all the prisoners. There is more competition for use of all resources—showers, toilets, phones, recreational equipment, space. These characteristics increase the likelihood that conflicts will erupt between prisoners and decrease the likelihood that officers will be able to effectively respond to those conflicts.

---

[35] 2019 DOJ Report at 34.

[36] *Id.*

[37] *See, e.g.*, Equal Justice Initiative, *Alabama Has Most Overcrowded Prisons in the Nation* (Aug. 27, 2019), https://eji.org/news/alabama-has-most-overcrowded-prisons-in-the-nation/.

82.     While the population of Alabama's prisons has skyrocketed, their staffing levels have consistently fallen.

83.     The Department's staffing problems have been the subject of numerous legislative hearings, lawsuits, and news reports. The Department has been under court order for years to increase its staffing levels.

84.     Despite the court order, its staffing levels are not improving.

85.     In fiscal year 2017, the Department reported "critical levels of authorized staffing shortages."[38]

86.     In February 2019, it reported that it needed to hire more than 2000 correctional officers and 125 correctional supervisors to adequately staff its men's prisons.[39]

87.     For the quarter ending June 2023, the Department reported a correctional staff vacancy rate of 62.50% across its entire prison system.[40] That same quarter, the Department reported that only one of its major facilities was staffed at more than 60%. In contrast, four of its major facilities were staffed at less than 30%; three more were staffed at less than 40%; and four more were staffed at less than 50%.

88.     The extreme understaffing means that prisoners are "unsupervised and largely left to their own devises."[41] And the severe overcrowding compounds the Department's supervision problems. Dorms of hundreds of inmates are regularly supervised by one officer. Some dorms are

---

[38] 2019 DOJ Report at 9.

[39] *Id.*

[40] Quarterly Correctional Staffing Report for the Quarter Ending June 30, 2023, ECF No. 4094-1, *Braggs v. Hamm*, No. 2:14cv601 (M.D. Ala.).

[41] *Id.* at 47.

nearly entirely unsupervised, with officers coming into the dorms only to count the prisoners several times a day. Most dorms remain locked, leaving hundreds of prisoners confined in an overcrowded space with no supervision and no reliable way to access help in the case of an emergency. Prisoners injured in fights, sexually assaulted, or who overdosed on drugs often wait hours before they are able to leave the dorms to get help. Seriously injured prisoners have died while locked in dorms without access to medical attention.

89.     The combination of overcrowding and understaffing across Alabama's prisons "results in prisons that are inadequately supervised, with inappropriate and unsafe housing designations, creating an environment rife with violence, extortion, drugs, and weapons."[42]

90.     This is the condition of the prisons in which Defendants hold thousands of Alabamians past their legally mandated release dates.

*Overdetention Is Widespread and Systemic*[43]

91.     The Department maintains data about the people in its custody, including their calculated release dates, their eligibility for mandatory release, their actual release dates, and the reasons for their releases. The Department's data show that since the original Mandatory Release Law went into effect on January 30, 2016, thousands of individuals have been held past their latest mandatory release dates.

92.     In the first 11 months of 2023, the Department released 2141 people onto mandatory release. Of those 2141 people, it held 684 (approximately 32 percent) past their latest

---

[42] 2019 DOJ Report at 5.

[43] The allegations in this section are based on data the Department produced in response to requests under Alabama's Public Records Act, Ala. Code § 36-12-40. These numbers are conservative estimates based on Plaintiffs' preliminary analysis of that data.

mandatory release dates, overdetaining people by 28 days on average. Those people accounted for 10,745 days of total overdetention.

93.     In 2022, the Department released 1738 people onto mandatory release. Of those 1738 people, it held 162 (approximately 10 percent) past their latest mandatory release dates, overdetaining people by 76 days on average. Those people accounted for 11,718 days of total overdetention.

94.     In 2021, the Department released 1218 people onto mandatory release. Of those 1218 people, it held 316 (approximately 26 percent) past their latest mandatory release dates, overdetaining people by 62 days on average. Those people accounted for 17,928 days of total overdetention.

95.     Between May and December of 2020, the Department released 1227 people onto mandatory release. Of those 1227 people, it held 440 (approximately 36 percent) past their latest mandatory release dates, overdetaining people by 62 days on average. Those people accounted for 26,212 days of total overdetention.

96.     In all, between May 2020 and November 2023, the Department overdetained approximately 26 percent of all the people it eventually released onto mandatory release. During that time, it held 1648 total people past their latest mandatory dates, accounting for 66,603 days—182 years—of total overdetention.[44]

97.     These numbers reflect only the Department's overdetention of individuals who were eventually released onto mandatory release.

---

[44] In 2021, the Department reported that it cost an average of $82.64 per day to incarcerate one individual. *See* Alabama Department of Corrections, *Annual Report for the Fiscal Year 2021* at 6, *available at* https://doc.alabama.gov/StatReports. Based on that amount, the Department's overdetention of people eventually released onto mandatory release between May 2020 and November 2023 cost the State approximately $5,504,071.92.

98.     However, on information and belief, since the Mandatory Release Law first went into effect, the Department has overdetained thousands of eligible individuals past their latest mandatory release dates by refusing to release them onto mandatory release *at all*—unlawfully incarcerating them until their end-of-sentence date and releasing them with no supervision.

99.     The Department's data indicate that from January 31, 2023, to November 14, 2023, the Department released 449 people from its custody because their straight sentences had expired. Of those 449 people, at least 185 (41 percent) of them should have been released onto mandatory release.[45] Those people were held, on average, 160 days past their latest mandatory release dates, and they accounted for a total of 29,517 days of overdetention.

100.    In 2022, the Department released 1010 people from its custody because their straight sentences had expired. Of those 1010 people, approximately 357 (35 percent) of them should have been released onto mandatory release. Those people were held, on average, 222 days past their latest mandatory release dates, and they accounted for a total of 79,469 days of overdetention.

101.    In 2021, the Department released 927 people from its custody because their straight sentences had expired. Of those 927 people, approximately 351 (36 percent) of them should have been released onto mandatory release. Those people were held, on average, 237 days past their latest mandatory release dates, and they accounted for a total of 83,354 days of overdetention.

---

[45] The numbers of people alleged to have been eligible for mandatory release in paragraphs 99–104 are based on the following assumptions: (1) every person admitted to Department custody after January 1, 2017, had an offense date that qualified them for mandatory release; (2) every person with an "S" suffix  (which designates an individual as having been convicted of a sex offense) was ineligible for mandatory release; (3) every person serving a sentence of five years or less but not earning good time was ineligible for mandatory release (because they likely were serving a split sentence); and (4) every person serving a sentence of greater than five years and/or earning good time was eligible for mandatory release if otherwise statutorily eligible (because they likely were not serving a split sentence).

102.    In 2020, the Department released 1702 people from its custody because their straight sentences had expired. Of those 1702 people, approximately 994 (58 percent) of them should have been released onto mandatory release. Those people were held, on average, 132 days past their latest mandatory release dates, and they accounted for a total of 131,854 days of overdetention.

103.    From May to December of 2019, the Department released 282 people from its custody because their straight sentences had expired. Of those 282 people, approximately 176 (62 percent) of them should have been released onto mandatory release. Those people were held, on average, 110 days past their latest mandatory release dates, and they accounted for a total of 19,470 days of overdetention.

104.    In all, between May 2019 and November 2023, the Department denied mandatory release altogether to approximately 2067 individuals who were likely entitled to mandatory release. Those individuals were released at the end of their sentences and returned to their communities with no post-release supervision. They accounted for 343,664 total days—941 years—of overdetention.[46]

105.    Finally, between May 2019 and November 2023, at least six people have *died* in the custody of the Department while being held past their latest mandatory release dates.[47]

---

[46] Based on the Department's reported average daily cost of incarceration of $82.64, *see supra* note 44, the Department's complete denial of mandatory release to eligible individuals between May 2019 and November 2023 cost the State approximately $444,706,885.

[47] Jonathon Delaney died in Department custody on May 3, 2023, seventeen days after the Department was required to release him onto mandatory release. Jackie Barnett died in Department custody on June 10, 2023, 141 days after the Department was required to release him onto mandatory release. Roy Quates died in Department custody on May 22, 2023, 111 days after the Department was required to release him onto mandatory release. Charles Harris died in Department custody on September 25, 2023, 353 days after the Department was required to release him onto mandatory release. Timothy Walden died in Department custody on September 30, 2023,

106.    The prevalence and persistence of the Department's overdetention of individuals past their latest mandatory release dates means that the Corrections Defendants, who are responsible for ensuring that individuals are timely released from Department custody and whose official duties require them to know about the Department's release trends, knew about the widespread overdetention of individuals past their latest mandatory release dates.

107.    Since the Mandatory Release Law first went into effect, hundreds of people (including attorneys and family members) have contacted the Department to inquire about an individual being held past his or her latest mandatory release date. The Department often responds to such an inquiry by investigating the individual's situation and releasing the individual onto mandatory release.

108.    The Corrections Defendants are each aware that hundreds of people have called requesting that individuals be released onto mandatory release. The Corrections Defendants also are each aware that the Department's investigation of these requests often results in those individuals being released to mandatory release.

109.    By virtue of their duties and responsibilities, the Corrections Defendants each know and have known for years that the Department's policies and/or lack of policies related to the Mandatory Release Law cause widespread overdetention.

110.    Nevertheless, the Corrections Defendants each have failed to take action to ensure that eligible individuals are timely released to supervision by the Board by their latest mandatory release dates.

---

255 days after the Department was required to release him onto mandatory release. Anthony Ware died in Department custody on October 5, 2023, 38 days after the Department was required to release him onto mandatory release.

111.    The prevalence and persistence of the Department's overdetention of individuals past their latest mandatory release dates also mean that the Parole Defendants, who are each responsible for ensuring that eligible individuals are supervised by the Board while on mandatory release, knew about the widespread overdetention of individuals past their latest mandatory release dates.

112.    Additionally, upon information and belief, since the Mandatory Release Law first went into effect, numerous attorneys and family members have contacted the Bureau to inquire about individuals being held past their latest mandatory release dates or being denied mandatory release altogether.

113.    For all these reasons, the Parole Defendants each knows and has known for years that the Bureau's policies and/or lack of policies related to the Mandatory Release Law cause widespread overdetention.

114.    Nevertheless, the Parole Defendants have failed to take action to ensure that eligible individuals are timely released to supervision by the Board by their latest mandatory release dates.

*Defendants' Policies and Practices Cause Overdetention*

115.    The terms of the Mandatory Release Law make it clear that both the Corrections Defendants and the Parole Defendants needed to maintain policies and practices to ensure that all eligible individuals are released from Department custody to supervision by the Board by their latest mandatory release dates.

116.    Nevertheless, Defendants failed and continue to fail to maintain policies and practices to ensure that individuals are released from the Department's custody to the Board's supervision by their latest mandatory release dates. These failures result in widespread and systematic overdetention.

*The Corrections Defendants Fail to Calculate and Track Individuals' Latest
Mandatory Release Dates*

117. Ensuring that all eligible individuals are timely released from the custody of the Department to supervision by the Board requires the Department to calculate and track each eligible individual's latest mandatory release date—the date by which the Department *must* release individuals to supervision by the Board.

118. The Corrections Defendants nevertheless failed to create and/or failed to enforce policies and practices ensuring that each eligible individual's latest mandatory release date is calculated and tracked. As a result, the Department calculates and tracks the latest mandatory release dates for individuals in its custody only haphazardly, arbitrarily, and on an ad hoc basis.

119. On information and belief, the Department does not calculate any individual's earliest mandatory release date or mandatory release range.

120. Because the Department regularly fails to calculate or track individuals' mandatory release dates, it fails to inform individuals that they are entitled to mandatory release and fails to release individuals by their latest mandatory release dates, resulting in their overdetention.

121. Because the Department fails to calculate and/or track every eligible individual's latest mandatory release date, it systematically fails to release people by their latest mandatory release dates, incarcerating them when it has no lawful authority to do so.

122. The Corrections Defendants maintain policies and practices of failing to calculate and track individuals' latest mandatory release dates despite knowing that those policies and practices result in widespread overdetention.

123. In the alternative, the Corrections Defendants maintain policies and practices of failing to calculate and track individuals' latest mandatory release dates with reckless disregard for the fact that such a failure results in widespread overdetention.

30

*Defendants Fail to Ensure that the Department and the Board Sufficiently Coordinate*
*to Timely Release All Eligible Individuals*

124.    Ensuring that eligible individuals are timely released from the Department's custody to supervision by the Board requires Defendants to maintain policies and practices to ensure adequate communication and coordination between the Department and the Board.

125.    Nevertheless, the Corrections Defendants fail to maintain policies and practices of coordinating with the Board in time to ensure that the Board is prepared to supervise all individuals by their latest mandatory release dates.

126.    The Parole Defendants similarly fail to maintain policies and practices of coordinating with the Department in time to ensure that the Board is prepared to receive all eligible individuals onto supervision by their latest mandatory release dates.

127.    As part of their official duties, the Parole Defendants are each familiar with the general trends in parole supervision in Alabama, including how many individuals are being supervised on mandatory release at any given time and for how long those individuals remain on mandatory supervision.

128.    For example, the Bureau reports the number of individuals being supervised on mandatory release and the number of individuals whose mandatory release was revoked each month in its Monthly Statistical Reports.[48] The Bureau also reports the number of individuals being supervised on mandatory release as of the end of each fiscal year in its Annual Reports.[49]

---

[48] The Bureau publishes its Monthly Statistical Reports online at https://paroles.alabama.gov/monthly-statistical-reports/.

[49] The Bureau publishes its Annual Reports online at https://paroles.alabama.gov/resources/annual-reports/.

129.     Additionally, upon information and belief, as part of their official duties, the Parole Defendants are each familiar with the process and resources required to receive individuals onto mandatory release and to supervise individuals on mandatory release.

130.     As part of their official duties, the Corrections Defendants are each familiar with the Department's general release trends, including how many individuals are released onto mandatory release and how long before their ends-of-sentence those individuals were released.

131.     For example, the Department reports the number of individuals released onto mandatory release each month in its Monthly Statistical Reports.[50]

132.     Additionally, as part of its internal record-keeping, the Department tracks individuals' projected end-of-sentence dates as well as the dates and reasons all individuals were released from the Department's custody.

133.     Defendants thus knew that failing to maintain policies and practices to ensure adequate communication and coordination between the Department and the Board when releasing individuals onto mandatory release would result in widespread overdetention. Defendants nevertheless failed to maintain such policies and practices.

134.     In the alternative, Defendants failed to maintain such policies and practices with reckless disregard for the fact that such a failure would result in widespread overdetention.

---

[50] The Department publishes its Monthly Statistical Reports online at https://doc.alabama.gov/statreports.

*The Corrections Defendants Fail to Timely Notify Victims Before Individuals' Latest Mandatory Release Dates*

135.    The Mandatory Release Law directs the Department to notify "the victim and interested parties" before releasing an eligible individual onto mandatory release to be supervised by the Board.[51]

136.    The law does not state that an individual's release is contingent on the Department successfully completing the required victim notification; instead, the law imposes the additional requirement that the Department notify victims before an individual's latest mandatory release date.

137.    In other words, the Mandatory Release Law imposes two separate requirements on the Department: (i) release all eligible individuals from its custody to supervision by the Board by their latest mandatory release dates; and (ii) notify all victims and interested parties before releasing eligible individuals.

138.    The Department nevertheless maintains a policy and practice of treating victim notification as a necessary precondition to release, detaining people until victims are notified even when that notification is not completed until after—often weeks or months after—individuals' latest mandatory release dates (the "Victim Notification Policy").

139.    Defendants publicized this policy in a joint media advisory on February 10, 2023, stating that "no inmate has been or will be released without victim notification."

---

[51] Ala. Code § 15-22-26.2(c).




**ALABAMA BUREAU OF PARDONS AND PAROLES**
**&**
**ALABAMA DEPARTMENT OF CORRECTIONS**

CAM WARD
DIRECTOR

JOHN Q. HAMM
COMMISSIONER

# MEDIA ADVISORY

February 10, 2023

**ABPP, ADOC PARTNER ON RELEASE TO MANDATORY SUPERVISION**

**MONTGOMERY, Ala.** – In accordance with changes to Alabama Code Section 15-22-26.2 (Mandatory Supervision Period on Certain Sentences) that went into effect January 31, 2023, the Alabama Department of Corrections (ADOC), will continue the process of releasing inmates to the supervision of the Alabama Bureau of Pardons and Paroles (ABPP).

Going forward, these releases will happen on the first and fourth Tuesday of each month.

Some inmates that qualify to be released from ADOC have detainers/pending charges from other law enforcement agencies and they will be transferred to those agencies. The remainder, once out of ADOC custody, are processed by ABPP and monitored using an electronic monitoring device.

No inmate has been or will be released without victim notification.

Individuals convicted of a sex offense involving a child (under the age of 12) are excluded as are offenders serving life sentences. Release of eligible inmates is based upon the length of sentence.

140.    Despite maintaining the Victim Notification Policy, the Corrections Defendants have failed to maintain a policy or practice of ensuring that the Department notifies each eligible individual's victims and interested parties before the individual's latest mandatory release date.

141.    Instead, upon information and belief, the Department frequently does not even begin the process of notifying an eligible individual's victim until the individual's latest mandatory release date has passed and he or she is already overdetained.

142.    The Victim Notification Policy, combined with the Department's failure to maintain a policy of ensuring that victims are notified before each individual's latest mandatory release date, results in systematic and widespread overdetention: individuals wait days, weeks, or months past their latest mandatory release dates for the Department to complete the victim-notification process.

143.    The Corrections Defendants maintain the Victim Notification Policy knowing that it results in widespread overdetention.

144.    In the alternative, the Corrections Defendants maintain the Victim Notification Policy with reckless disregard for the fact that it results in widespread overdetention.

*Defendants Deny Mandatory Release to Previous Parole Violators*

145.    Defendants maintain a policy or practice of denying mandatory release to eligible individuals who have previously violated parole or probation (the "Parole Violator Policy").

146.    Pursuant to the Parole Violator Policy, eligible individuals who have previously violated parole or probation are denied mandatory release and are held by the Department until their end-of-sentence date or until a third party (usually a family member or an attorney) advocates for the individuals' releases.

147.    Defendants maintain the Parole Violator Policy even though the Mandatory Release Law applies to individuals who have previously violated parole or probation. The Parole Violator Policy is therefore directly contrary to the Mandatory Release Law.

148.    Because of the Parole Violator Policy, the Department systematically fails to release people by their latest mandatory release dates.

149.    Defendants maintain the Parole Violator Policy knowing that it results in widespread overdetention.

150.    In the alternative, Defendants maintain the Parole Violator Policy with reckless disregard for the fact that it results in widespread overdetention.

*Defendants Deny Mandatory Release to Individuals Pending Home Plan Approval*

151.    Defendants maintain a policy that the Department will not release any individual to supervision by the Board on mandatory release unless and until the Bureau and/or Board approves the individual's home plan (the "Home Plan Approval Policy").

152.    Pursuant to the Home Plan Approval Policy, the Department refuses to release any individual until the Board has approved the individual's home plan.

153.    Pursuant to the Home Plan Approval Policy, the Board refuses to accept onto supervision any individual until it has approved the individual's home plan.

154.    Defendants nevertheless fail to maintain policies and practices to ensure that the Board reviews and approves all eligible individuals' home plans by their latest mandatory release dates.

155.    Defendants maintain the Home Plan Approval Policy even though the Mandatory Release Law does not require that individuals' home plans be approved prior to their releases. The Home Plan Approval Policy is therefore directly contrary to the Mandatory Release Law.

156.    Because of the Home Plan Approval Policy, the Department systematically fails to release people by their latest mandatory release dates.

157.    Defendants maintain the Home Plan Approval Policy knowing that it results in widespread overdetention.

158.    In the alternative, Defendants maintain the Home Plan Approval Policy with reckless disregard for the fact that it results in widespread overdetention.

*Defendants Release Individuals Only Twice Per Month*

159.    Defendants maintain a policy or practice of releasing individuals from the Department's custody to supervision by the Board on mandatory release only twice a month (the "Tuesday Policy").

160.    Pursuant to the Tuesday Policy, individuals are released onto mandatory release only on the second and fourth Tuesdays of each month, even if the individuals' latest mandatory release dates fall before those dates.

161.    For example, pursuant to the Tuesday Policy, an individual whose latest mandatory release date falls on the second Wednesday of a month will be held in Department custody and not released to supervision by the Board until the fourth Tuesday of that month—thirteen days after the individual's latest mandatory release date.

162.    Defendants publicized a version of this policy in the joint media advisory issued on February 10, 2023, and recreated in paragraph 139, *supra*. In that media advisory, Defendants stated that mandatory releases "will happen on the first and fourth Tuesday of each month."[52]

163.    Defendants maintain the Tuesday Policy even though the Mandatory Release Law contains no requirement that individuals be released on a certain day of the week. The Tuesday Policy is therefore directly contrary to the Mandatory Release Law.

164.    Because of the Tuesday Policy, the Department systematically fails to release people by their latest mandatory release dates.

165.    Defendants maintain the Tuesday Policy knowing that it results in widespread overdetention.

166.    In the alternative, Defendants maintain the Tuesday Policy with reckless disregard for the fact that it results in widespread overdetention.

167.    In all, despite the Mandatory Release Law's mandatory language, which directs that the Department *shall* release eligible individuals to supervision by the Board a specific number of months before their end-of-sentence dates, Defendants have both (i) failed to maintain policies and practices to ensure that all eligible individuals are released by their latest mandatory release dates and (ii) maintained policies and practices that treat the Mandatory Release Law as discretionary and treat individuals as *eligible* for release on their latest mandatory release dates

---

[52] At some point after publicizing the Tuesday Policy, Defendants began releasing instead on the second and fourth Tuesday of each month.

rather than *entitled* to release on those dates. By maintaining these policies and practices, Defendants have systematically and with deliberate indifference caused the overdetention of thousands of Alabamians.

*The Amended Mandatory Release Law Violates The Ex Post Facto Clause*

168.    The amended Mandatory Release Law applies to every person "in the custody of the department without regard to when he or she was sentenced for or committed the crime."[53] This violates the Ex Post Facto Clause of the U.S. Constitution when applied to individuals sentenced to ten years or more in prison for crimes that occurred after January 30, 2016, and before January 31, 2023.

169.    The original Mandatory Release Law became effective January 30, 2016, and it applied only to those whose offenses occurred after that date.[54]

170.    The original Mandatory Release Law created a mandatory release range for individuals sentenced to ten years or more in prison of twelve to twenty-four months.[55]

171.    Thus, a person who committed a crime when the original Mandatory Release Law was in effect and received a prison sentence of ten years or more would expect that his or her punishment included release to supervision by the Board at least twelve months and as many as twenty-four months before his or her end-of-sentence date.

---

[53] Ala. Code § 15-22-26.2(f) (2023).

[54] *See supra* note 14.

[55] The original Mandatory Release Law directed that a defendant sentenced to ten years or more in prison be released to supervision by the Board "no less than 12 months and no more than 24 months prior to" his or her release date. Ala. Code § 15-22-26.2 (2016).

172.    The amended Mandatory Release Law became effective January 31, 2023, and directed that it would apply to every person "in the custody of the department without regard to when he or she was sentenced for or committed the crime."[56]

173.    The amended Mandatory Release Law reduced the mandatory release range for individuals sentenced to ten years or more in prison from twelve to twenty-four months to ten to twelve months.[57]

174.    Thus, a person who commits a crime with the amended Mandatory Release Law in effect and receives a sentence of ten years or more in prison would expect that his or her punishment includes release to supervision by the Board at least ten months and as many as twelve months before his or her end-of-sentence date.

175.    By applying to everyone, including those sentenced to ten years or more in prison for crimes that occurred when the original Mandatory Release Law was in effect (after January 30, 2016, and before January 31, 2023), the amended Mandatory Release Law imposes additional prison time on this class of people and violates the Ex Post Facto Clause of the U.S. Constitution.

176.    "To fall within the *ex post facto* prohibition, a law must be retrospective—that is, 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it,' by altering the definition of criminal conduct or increasing the punishment for the crime."[58]

---

[56] *Id.* § 15-22-26.2(f) (2023).

[57] The amended Mandatory Release Law directs that a defendant sentenced to ten years or more in prison be released to supervision by the Board "no less than 10 months and no more than 12 months prior to" his or her release date. Ala. Code § 15-22-26.2 (2023).

[58] *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (quoting *Weaver v. Graham*, 450 U.S. 24, 29 (1981)).

177.     Application of the amended Mandatory Release Law to those sentenced to ten years or more in prison for crimes that occurred after January 30, 2016, and before January 31, 2023, meets both of these requirements.

178.     The amended Mandatory Release Law is retrospective; it applies to every person "in the custody of the department without regard to when he or she was sentenced for or committed the crime."[59]

179.     The amended Mandatory Release Law also disadvantages individuals sentenced to ten years or more in prison for crimes committed between January 30, 2016, and January 30, 2023. By reducing an individual's mandated period of supervision from twelve months to ten months and the individual's authorized period of supervision from twenty-four months to twelve months, the law creates a "significant risk of prolonging the period of incarceration" for those people; it allows the Department to imprison those people two to twelve months longer than it was allowed to under the original Mandatory Release Law.[60]

180.     By applying the current version of the Mandatory Release Law to individuals sentenced to ten years or more in prison for crimes that occurred after January 30, 2016, and before January 31, 2023, Defendants violate the Ex Post Facto Clause of the U.S. Constitution.

## INDIVIDUAL PLAINTIFF ALLEGATIONS

181.     Plaintiff Derrick Singleton was sentenced on January 29, 2021, to two concurrent terms of fifteen years in prison. With earned good time, his calculated end-of-sentence date was December 28, 2024. Because he was serving concurrent sentences of fifteen years in prison for crimes with offense dates of March 30, 2018, Alabama law mandated that the Department release

---

[59] Ala. Code § 15-22-26.2(f) (2023).

[60] *Garner v. Jones*, 529 U.S. 244, 250 (2000).

him to supervision by the Board no less than twelve months before his calculated end-of-sentence date, or December 28, 2023. He was not released until February 27, 2024, sixty-one days after his legally mandated release date.

182.    Plaintiff Ray Traylor was sentenced on January 26, 2022, to a term of ten years in prison. With earned good time, his calculated end-of-sentence date was December 24, 2024. Because he was serving a sentence of ten years in prison for a crime with an offense date of December 21, 2020, Alabama law mandated that the Department release him to supervision by the Board no less than twelve months before his calculated end-of-sentence date, or December 24, 2023. He was not released until December 26, 2023, two days after his legally mandated release date.

183.    Plaintiff Deandra Whitehead was sentenced on October 23, 2019, to a term of ninety-seven months (approximately eight years) in prison. Her calculated end-of-sentence date was April 12, 2024. Because she was serving a sentence of ninety-seven months in prison for a crime with an offense date of September 19, 2017, Alabama law mandated that the Department release her to supervision by the Board no less than six months before her calculated end-of-sentence date, or October 12, 2023. She was not released until February 13, 2024, 124 days after her legally mandated release date.

## CLASS ALLEGATIONS

184.    All named Plaintiffs bring their claims on behalf of themselves individually and, under Federal Rule of Civil Procedure 23(b)(3), on behalf of a class (the "Class") consisting of all people:

- previously or currently held in Department custody;

- who were or are entitled to mandatory release under Alabama Code § 15-22-26.2;

- but who were not released or have not been released to supervision by the Board by the time of their latest mandatory release date;

- during the two-year period prior to the filing of this Complaint as to the federal law claims, and during the six-year period prior to the filing of this Complaint as to the state law claims.

185.   Plaintiffs Singleton and Traylor also bring a federal claim on behalf of a subclass (the "Ex Post Facto Subclass") consisting of all individuals who meet the above criteria and who:

- were sentenced to ten years or more in prison;

- for crimes that occurred between January 30, 2016, and January 30, 2023.

186.   The Class satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3). Questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

187.   Numerosity: Upon information and belief, members of the Class are so numerous that joinder of all class members is impracticable. Given the number of detained Alabamians subject to Defendants' practices, there are hundreds or thousands of class members that can be identified through Defendants' records. In fact, it appears from the Department's own public data that more than 1000 individuals have been overdetained past their latest mandatory release dates in the two-year period prior to the filing of this Complaint.[61] It also appears from publicly available information that the Department overdetains an average of eighty people per month beyond their latest mandatory release dates, meaning that the Class will continue to grow as this litigation pends.

188.   Commonality: This case presents common questions of law and fact, including but not limited to:

---

[61] The Department's publicly available data indicate that approximately 1082 individuals were held past their latest mandatory release dates between August 7, 2022, and November 14, 2023. *See supra* ¶¶ 91–105.

a. Whether the Mandatory Release Law required Defendants to release individuals from custody in a specified time period prior to the end of their sentence;

b. Whether Defendants held Plaintiffs past their latest mandatory release dates as provided by Alabama law;

c. Whether Defendants violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution when they held Plaintiffs and the class members past their latest mandatory release dates;

d. Whether Defendants violated the Eighth Amendment to the U.S. Constitution when they held Plaintiffs and the class members past their latest mandatory release dates;

e. Whether Defendants applied the amended Mandatory Release Law's mandatory release range for individuals sentenced to ten years or more in prison to individuals convicted of crimes that occurred between January 30, 2016, and January 30, 2023;

f. Whether Defendants violated the Ex Post Facto Clause of the U.S. Constitution when they applied the amended Mandatory Release Law's mandatory release range for individuals sentenced to ten years or more in prison for crimes that occurred between January 30, 2016, and January 30, 2023;

g. Whether Defendants violated Alabama law when they held Plaintiffs and the class members past their latest mandatory release dates;

h. Whether Defendants enacted or failed to enact policies on grounds generally applicable to the class and which resulted in systematic overdetention;

i. The proper measure of damages; and

j. The proper measure of punitive damages.

189. Typicality: Plaintiffs' claims are typical of the members of the Class. The constitutional and state law violations suffered by Plaintiffs are typical of those suffered by other class members. Defendants committed the same violations against Plaintiffs as they did against other class members, in accordance with the same policies and practices, as well as by the omissions in those policies and practices. Discovery will show that Defendants used uniform processes and procedures to determine when to release Plaintiffs and the class members, which resulted in Plaintiffs and the class members being held past their release dates.

190.    Adequacy: Plaintiffs are adequate representatives of the Class because their interests coincide with, and are not antagonistic to, the putative class members' interests. Plaintiffs have retained experienced and competent counsel with experience litigating statewide class actions in civil rights matters; they intend to continue to prosecute this action vigorously; they and their counsel will fairly and adequately protect the interests of the members of the Class; and they and their counsel have no interest that might cause them to not vigorously pursue this action.

191.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct, as described in this Complaint, stems from common and uniform policies and practices, and omissions in those policies and practices, and has resulted in common violations of the U.S. Constitution and state law. A class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each putative class member are such that individual prosecution would prove burdensome and expensive. It would be nearly impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if class members could afford it, individual litigation would be an unnecessary burden on Alabama's federal courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case concerning Defendants' uniform practices, policies, and omissions. Moreover, management of this action as a class action

will not present any likely difficulties given the common patterns and practices at issue across the entire state of Alabama. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

192.    The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

193.    Plaintiffs' claims that they were overdetained will not require individual trials as to damages. A determination of damages can be made in a uniform, straightforward manner using objective, easily ascertainable criteria, such as a set rate per day of overdetention.

## CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS
### Violation of the Fourteenth Amendment
*(Plaintiffs and the Class against Defendants)*

194.    Plaintiffs repeat and re-allege Paragraphs 1–167 and 181–183 as if fully set forth in this Count.

195.    Plaintiffs bring this claim on their own behalf and on behalf of members of the putative Class.

196.    At all times relevant to the allegations in this Complaint, Defendants have acted under color of state law.

197.    The law is clearly established that incarcerating a person after the legal authority to hold that person has expired violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. A jailor has no privilege to detain a person beyond the expiration of that person's lawful sentence.

198.    The Department's legal authority to hold Plaintiff Singleton expired on December 28, 2023, and the Department was required to release him to supervision by the Board on that date.

Yet pursuant to the Defendants' unlawful policies and practices, the Department continued to detain and the Board refused to accept supervision of Plaintiff Singleton until February 27, 2024, sixty-one days after his carceral sentence expired.

199.    The Department's legal authority to hold Plaintiff Traylor expired on December 24, 2023, and the Department was required to release him to supervision by the Board on that date. Yet pursuant to the Defendants' unlawful policies and practices, the Department continued to detain and the Board refused to accept supervision of Plaintiff Traylor until December 26, 2023, two days after his carceral sentence expired.

200.    The Department's legal authority to hold Plaintiff Whitehead expired on October 12, 2023, and the Department was required to release her to supervision by the Board on that date. Yet pursuant to the Defendants' unlawful policies and practices, the Department continued to detain and the Board refused to accept supervision of Plaintiff Whitehead until February 13, 2024, 124 days after her carceral sentence expired.

201.    The Department unlawfully, intentionally, and without Plaintiffs' consent held Plaintiffs in Department custody against Plaintiffs' wishes. Plaintiffs were aware that they were not free to leave Department custody, and they were held in Department custody with physical force, threats of physical force, and/or intimidation. This false imprisonment caused Plaintiffs harm and was done pursuant to the policies and practices maintained by Defendants described above in Paragraphs 115–167.

202.    Defendants' adoption and/or enforcement of these policies and practices was deliberately indifferent and was done with evil motive or intent or with callous or reckless indifference to the federally protected rights of others because Defendants adopted and/or enforced these policies and practices either knowing they result in the systematic overdetention of individuals like Plaintiffs and the putative class members or with callous or reckless indifference

46

to whether these policies and practices result in the systematic overdetention of individuals like Plaintiffs and the members of the putative class.

203.    Defendants' actions caused Plaintiffs' overdetention because Defendants had the ability and authority to create and enforce policies and practices ensuring that individuals like Plaintiffs are released from the custody of the Department to supervision by the Board by their latest mandatory release dates, in accordance with Alabama law. Had Defendants maintained policies and practices ensuring that individuals were so released, Plaintiffs and members of the putative class would have been released by their latest mandatory release dates and would not have been overdetained.

### COUNT II: 42 U.S.C. § 1983 - CRUEL AND UNUSUAL PUNISHMENT
### Violation of the Eighth Amendment
#### (Plaintiffs and the Class against Defendants)

204.    Plaintiffs repeat and re-allege Paragraphs 1–167 and 181–183 as if fully set forth in this Count.

205.    Plaintiffs bring this claim on their own behalf and on behalf of the putative Class.

206.    At all times relevant to the allegations in this Complaint, Defendants have acted under color of state law.

207.    The law is clearly established that incarcerating a person beyond the termination of that person's carceral sentence violates the Eighth Amendment to the U.S. Constitution.

208.    The Department's legal authority to hold Plaintiff Singleton expired on December 28, 2023, and the Department was required to release him to supervision by the Board on that date. Yet pursuant to the Defendants' unlawful policies and practices, the Department continued to detain and the Board refused to accept supervision of Plaintiff Singleton until February 27, 2024, sixty-one days after his carceral sentence expired.

209.    The Department's legal authority to hold Plaintiff Traylor expired on December 24, 2023, and the Department was required to release him to supervision by the Board on that date. Yet pursuant to the Defendants' unlawful policies and practices, the Department continued to detain and the Board refused to accept supervision of Plaintiff Traylor until December 26, 2023, two days after his carceral sentence expired.

210.    The Department's legal authority to hold Plaintiff Whitehead expired on October 12, 2023, and the Department was required to release her to supervision by the Board on that date. Yet pursuant to the Defendants' unlawful policies and practices, the Department continued to detain and the Board refused to accept supervision of Plaintiff Whitehead until February 13, 2024, 124 days after her carceral sentence expired.

211.    The Department unlawfully, intentionally, and without Plaintiffs' consent held Plaintiffs in Department custody against Plaintiffs' wishes. Plaintiffs were aware that they were not free to leave Department custody, and they were held in Department custody with physical force, threats of physical force, and/or intimidation. This false imprisonment caused Plaintiffs harm and was done pursuant to the policies and practices maintained by Defendants described above in Paragraphs 115–167.

212.    Defendants' adoption and/or enforcement of these policies and practices was deliberately indifferent and was done with evil motive or intent or with callous or reckless indifference to the federally protected rights of others because Defendants adopted and/or enforced these policies and practices either knowing they result in the systematic overdetention of individuals like Plaintiffs and the putative class members or with callous or reckless indifference to whether these policies and practices result in the systematic overdetention of individuals like Plaintiffs and the members of the putative class.

213.     Defendants' actions caused Plaintiffs' overdetention because Defendants had the ability and authority to create and enforce policies and practices ensuring that individuals like Plaintiffs are released from the custody of the Department to supervision by the Board by their latest mandatory release dates, in accordance with Alabama law. Had Defendants maintained policies and practices ensuring that individuals were so released, Plaintiffs and members of the putative class would have been released by their latest mandatory release dates and would not have been overdetained.

### COUNT III: 42 U.S.C. § 1983 – RETROACTIVE IMPOSITION OF ADDITIONAL PUNISHMENT
### Violation of the Ex Post Facto Clause
### *(Plaintiffs Derrick Singleton and Ray Traylor and the Ex Post Facto Subclass against Defendants)*

214.     Plaintiffs repeat and re-allege Paragraphs 1–90 and 168–182 as if fully set forth in this Count.

215.     Plaintiffs Derrick Singleton and Ray Traylor bring this claim on their own behalf and on behalf of the putative Ex Post Facto Subclass.

216.     At all times relevant to the allegations in this Complaint, Defendants have acted under color of state law.

217.     At the time Plaintiffs Singleton and Traylor's crimes of conviction occurred, the original Mandatory Release Law was in effect.

218.     The original Mandatory Release Law created a mandatory release range of twelve to twenty-four months for individuals sentenced to ten years or more in prison.

219.     Thus, a person who committed a crime when the original Mandatory Release Law was in effect and was sentenced to ten years or more in prison would expect that his or her punishment would include release to supervision by the Board at least twelve months and as many as twenty-four months before the end of his or her sentence.

49

220.    The amended Mandatory Release Law went into effect on January 31, 2023, and reduced the mandatory release range for individuals sentenced to ten years or more in prison from twelve to twenty-four months to ten to twelve months.

221.    Defendants maintain a policy and practice of applying the amended Mandatory Release Law to all people, including those sentenced to 10 years or more in prison for crimes that occurred between January 30, 2016, and January 30, 2023.

222.    The Ex Post Facto Clause of Article 1, Section 9 of the U.S. Constitution forbids states from enacting any law that imposes a punishment for an act that was not punishable at the time it was committed or that imposes additional punishment to that then prescribed.[62]

223.    By applying the amended Mandatory Release Law's mandatory release range for individuals sentenced to ten years or more in prison to individuals convicted of crimes that occurred between January 30, 2016, and January 30, 2023, Defendants impose additional prison time on this class of people and violate the Ex Post Facto Clause of the U.S. Constitution.

224.    Defendants' application of the amended Mandatory Release Law in this way creates a "significant risk of prolonging the period of incarceration" for this class of people by reducing the mandated period of supervision from twelve months to ten months and reducing the authorized period of supervision from twenty-four months to twelve months.

225.    By applying the amended Mandatory Release Law's mandatory release range to Plaintiffs Singleton and Traylor, Defendants caused Plaintiffs and members of the putative Ex Post Facto Subclass to remain in prison beyond the expiration of their carceral sentences.

226.    Plaintiffs Singleton and Traylor have suffered harm as a direct and proximate cause of Defendants violation of their rights under the Ex Post Facto Clause and 42. U.S.C. § 1983.

---

[62] U.S. Const. art. I, § 9.

## COUNT IV: FALSE IMPRISONMENT
### Ala. Code § 6-5-170
### *(Plaintiffs and the Class against the Corrections Defendants)*

227.    Plaintiffs repeat and re-allege Paragraphs 1–167 and 181–183 as if fully set forth in this Count.

228.    Plaintiffs bring this claim on their own behalf and on behalf of the putative class members who were also falsely imprisoned by Defendants.

229.    False imprisonment is the unlawful detention of a person by another for any length of time that deprives the person of their personal liberty.[63]

230.    The Corrections Defendants[64] have committed the tort of false imprisonment against Plaintiffs and the putative class members by intentionally and unlawfully detaining them beyond their legal release dates, causing the injuries described in this Complaint.

231.    By failing to release Plaintiffs and the putative class members on their legally mandated release dates, Plaintiffs and the putative class members remained incarcerated and were restrained against their will.

232.    Plaintiffs and the putative class members were conscious of their confinement and overdetention.

233.    Plaintiffs and the putative class members did not consent to the confinement.

234.    The confinement of Plaintiffs and the putative class members was not privileged by any judicial authorization.

---

[63] Ala. Code § 6-5-170.

[64] "In any civil action, it shall be permissible to allege in any pleading that any party or parties committed an act, and proof that any such party or parties committed such act by or through an agent, servant, or employee acting within the line and scope of his employment shall be sufficient proof of such allegation." Ala. Code § 6-5-300.

235.    The confinement of Plaintiffs and the putative class members was done consciously and deliberately by Defendants with malice and with a reckless and/or conscious disregard for the rights of plaintiffs and the putative class.

236.    Plaintiffs and the putative class members suffered damages as a result of their confinement and overdetention.

### COUNT V: NEGLIGENCE
### *(Plaintiffs and the Class against Defendants)*

237.    Plaintiffs repeat and re-allege Paragraphs 1–167 and 181–183 as if fully set forth in this Count.

238.    Plaintiffs bring this claim on their own behalf and on behalf of the putative Class members who were also negligently overdetained by Defendants.

239.    Based on their professional roles, Defendants owe duties to avoid overdetaining and causing harms to people in the Department's custody, including Plaintiffs and all members of the putative Class.

240.    The Corrections Defendants have a duty of ensuring that the Department accurately calculates the release dates for all individuals in the Department's custody, including Plaintiffs and members of the putative Class.

241.    The Corrections Defendants also have a duty of ensuring that people are timely released from the Department's custody, including Plaintiffs and members of the putative Class.

242.    The Corrections Defendants breached the standard of care they owed to Plaintiffs and the members of the putative Class by maintaining policies and practices that did not ensure that Plaintiffs and the members of the putative Class were released from the Department's custody on their legal release dates.

243.    The Parole Defendants have a duty of ensuring that the Board supervises all individuals eligible for supervision under the Mandatory Release Law, including Plaintiffs and members of the putative Class.

244.    The Parole Defendants breached the standard of care they owed to Plaintiffs and members of the putative Class by maintaining policies and practices that resulted in eligible individuals not being released to supervision by the Board by their latest mandatory release dates.

245.    Defendants' breach of the duty of care they owed to Plaintiffs and members of the putative Class resulted in their unlawful overdetention.

246.    The risks and harms that Defendants caused are within the scope of protection afforded by the duties Defendants owe to Plaintiffs and members of the putative Class.

247.    As a result of Defendants' acts and omissions, Plaintiffs and members of the putative Class suffered actual, foreseeable harm, as described in this Complaint.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs Singleton, Traylor, and Whitehead, on behalf of themselves and the putative Class they seek to represent, request that this Court grant the following relief:

1.    Issue an Order certifying this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3);

2.    Declare that the policies, practices, and conduct of Defendants, as described in this Complaint, constitute violations of the rights of Plaintiffs and members of the putative Class under the Eighth and Fourteenth Amendments and Article I, Section 9, Clause 3 of the Constitution of the United States;

3.    Declare that Corrections Defendants falsely imprisoned Plaintiffs and members of the putative Class in violation of Ala. Code § 6-5-170;

4.      Declare that all Defendants breached the duties of care they owe to Plaintiffs and members of the putative Class, causing their overdetention;

5.      Issue a class-wide order and judgment against Defendants awarding nominal, compensatory, and punitive damages in an amount to be determined at trial to Plaintiffs and to members of the putative Class;

6.      Award Plaintiffs reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

7.      Award Plaintiffs such other and further relief as this Court may deem appropriate and just.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

DATED: August 8, 2024

Respectfully submitted,

**DERRICK SINGLETON, RAY TRAYLOR, and DEANDRA WHITEHEAD, on behalf of themselves and all similarly situated individuals**

By: */s/ Joseph Mitchell McGuire*
One of Plaintiffs' Attorneys

Joseph Mitchell McGuire (ASB-8317-269M)
Susanne Cordner (ASB-4687-C61N)
MCGUIRE & ASSOCIATES
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000 (Telephone)
334-517-1327 (Fax)
jmcguire@mandabusinesslaw.com
scordner@mandabusinesslaw.com

Bridget Geraghty (*motion to appear pro hac vice forthcoming*)
Sana Naqvi (*motion to appear pro hac vice forthcoming*)
RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
160 East Grand Avenue, 6th Floor
Chicago, Illinois 60611
312-503-0962 (Telephone)
312-503-0891 (Fax)
bridget.geraghty@macarthurjustice.org
sana.naqvi@macarthurjustice.org

Stacey K. Grisby (*motion to appear pro hac vice forthcoming*)
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
202-662-6000 (Telephone)
sgrigsby@cov.com

Robert Gianchetti (*motion to appear pro hac vice forthcoming*)
COVINGTON & BURLING LLP
The New York Times Building
610 Eighth Avenue
New York, New York 10018
212-841-1000 (Telephone)
rgianchetti@cov.com

J. Patrick McNichol (*motion to appear pro hac vice forthcoming*)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
703-424-7572 (Telephone)
703-591-0167 (Fax)
pat@kellyguzzo.com

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on August 8, 2024, a true and correct copy of this Complaint was filed with the Clerk of Court via CM/ECF.

*/s/ Joseph Mitchell McGuire*